**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
The Honorable Michael E. Romero**

| | |
|---|---|
| In re: | ) |
| | ) Case No. 12-25005 MER |
| HYUNGKEUN SUN, and | ) |
| YEONAM KIM SUN, | ) Chapter 7 |
| | ) |
| Debtors. | ) |
| | ) |
| | ) |
| WONJOONG KIM, and | ) Adversary No. 12-1660 MER |
| YOONEE KIM, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| HYUNGKEUN SUN | ) |
| YEONAM KIM SUN, | ) Signed/Docketed |
| | ) September 12, 2014 |
| Defendants. | ) |

## ORDER

This case offers an object lesson in the oft-cited dangers of doing business with friends.  The Plaintiffs paid $900,000 to their friends, the Defendants, in exchange for a particular investment.  What Plaintiffs received was far from what was promised.  They now seek a finding their debt is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).[1]

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 (a) and (b) and 157(a) and (b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) as it concerns a determination as to the dischargeability of a particular debt.

## BACKGROUND

Plaintiff Wonjoong Kim ("W. Kim") is a professor at the University of Seoul, Korea, where he resides most of the year, visiting his family in the United

---

[1]  Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

States two to three times per year for a month at a time.  His wife, Co-Plaintiff Yoonee Kim ("Y. Kim"), and their daughters reside in Colorado.  Beginning in approximately 2001, the Kims became friends with Defendants Hyungkeun Sun ("H. Sun") and Yeonam Kim Sun ("Y. Sun"), who attended their church.  By 2006, the Kims and the Suns had become very close, a relationship both the Kims and the Suns described as "like family."

H. Sun had an excellent reputation in the church and in the area's Korean community as a successful real estate investor.  When W. Kim found it difficult to transfer funds from Korea to fund family expenses, he asked H. Sun for advice in finding a commercial property for purchase which would generate a monthly income stream.  The Kims told H. Sun they wished to limit their investment to $500,000, retaining $400,000 of their approximately $900,000 in savings to purchase a house in Colorado.

In March 2007, H. Sun contacted W. Kim with a proposal to purchase an interest in a commercial site on West Colfax in Denver (the "JCRS Property") for $900,000.  The JCRS Property was owed by the Suns' wholly-owned corporation, Y & K Sun, Inc. ("YKSI").  H. Sun convinced the Kims to invest their entire $900,000 by making the following representations:

- The JCRS Property needed $1 million for renovations and improvements.

- The JCRS Property was encumbered by a current loan of $3 million.

- H. Sun had arranged a refinancing of $4 million for the JCRS Property, and that such financing was a "done deal."  He showed the Kims a copy of a mortgage application for the JCRS Property in support of the assertion.[2]

- The JCRS Property would be worth approximately $6 million when the renovations were completed and the expected lessees had moved in.[3]

- After the refinancing paid off the existing $3 million loan, the Suns and the Kims would split the remaining $1 million in refinancing proceeds fifty-fifty.[4]  This would provide an almost immediate return of $500,000 of the Kims' investment to enable the Kims to purchase a house, while the improved JCRS Property would provide the Kims $3,000 per month in income beginning three months after the investment.

---

[2] Exhibit 3.

[3] *See* Transcript of March 20, 2014, p. 140, lines 20-22 (W. Kim testified H. Sun told him the property was really worth $6 million).

[4] *See* Exhibit 1.

- There were already new leases signed for a clothing store and a restaurant on the JCRS Property.

- H. Sun would guarantee the value of the investment.[5]

None of the above representations was true.  Instead of using the investment to purchase a real estate interest in the JCRS Property, as originally proposed, H. Sun constructed the $900,000 investment as a purchase by the Kims of 50% of the shares of YKSI.  Allegedly, this resulted from a concern expressed by the Suns' attorney, Carl Reem, that a sale of a partial interest in the JCRS Property could trigger the existing mortgage's "due on sale" clause.  As part of this investment change, a stock purchase agreement (the "First SPA")[6] was drafted.  H. Sun represented the value of the stock was equal to or greater than the value of the $900,000 investment.  The Kims signed the First SPA on April 17, 2007.

However, W. Kim's Korean bank refused to release the funds for the purchase absent evidence of a real property sale and a deed of trust in accordance with the original proposal.  After the bank balked, W. Kim contacted H. Sun and told him he was no longer interested in the deal.  But H. Sun convinced the Kims to complete the transaction and supplied a contract for purchase and sale of real property[7] to be sent to the Korean bank.  Upon receipt of the contract, the bank released the $900,000.[8]  Immediately upon the Kims' receipt of the $900,000, H. Sun again transformed the deal into a stock purchase transaction.  A new stock purchase agreement (the "Second SPA") was thereafter drafted and signed by the wives, Y. Sun and Y. Kim, on May 17, 2007.[9]

---

[5] According to H. Sun, he also told the Kims a sale of the JCRS Property in a so-called "1031 exchange" was possible within six months to a year, following the leasing of the renovated property.

[6] Exhibit 4.

[7] Exhibit 8.

[8] The Court also notes the First SPA (Exhibit 8) did not represent the true transaction of the parties.  Specifically, the purchase and sale agreement stated the "purchase price" for 50% of the JCRS Property was $4.3 million, with $900,000 serving as "earnest money."  *See* Exhibit 8, p. 1, and p. 2, ¶ 4-A.  *See also* Transcript of March 20, 2014, p. 86, line 4–p. 87, line 6 (testimony of W. Kim).

[9] Exhibit 9.

At Y. Sun's direction, Y. Kim made the $900,000 check payable to "Y + K Sun."[10]  Y. Kim believed she was giving a check to YKSI for the purchase of 50% of the company.[11]  Although the Kims had become 50% shareholders, Y. Sun had, without the Kims' knowledge, opened a new personal bank account into which she, "Y. K. Sun," deposited the $900,000 check.[12]

YKSI's 2007 and 2008 amended tax returns indicate the Kims "contributed $900,000 to Y & K Sun, Inc." and show the $900,000 investment as a "loan" to the Suns as shareholders of YKSI.[13]  No such loan was ever authorized by YKSI's board of directors.

In April 2008, YKSI sold a commercial property on East Mississippi Avenue in Aurora, Colorado (the "Mississippi Property") to an entity known as S & B Nova, which was controlled by a Mr. and Mrs. Lee (the "Lees").  The sale was financed by Hanmi Bank, which held a first priority lien against the Mississippi Property in the approximate amount of $1,726,000.[14]  YKSI received from S & B Nova a promissory note (the "S & B Nova Note"), secured by a junior lien, in the approximate amount of $1,035,000, and $347,000 in cash.  Although the Kims owned 50% of YKSI's stock, the Kims were not informed of the Mississippi Property sale, and received no distribution from the proceeds of the sale.

Three months later, H. Sun told the Kims he was going to put YKSI into bankruptcy, and the Kims would lose their $900,000 investment unless they exchanged their 50% interest in YKSI for YKSI's interest in the $1,035,000 S & B Nova note.[15]  H. Sun explained the note paid monthly income of $6,200, but the Kims would only receive half of that amount.  H. Sun represented the remaining half interest would be retained by the Suns as they and YKSI were in financial distress.  H. Sun did not inform the Kims the S & B Nova Note was in a subordinate position to Hanmi Bank's note.  H. Sun also failed to inform the

---

[10]  Exhibit 12.

[11]  Stock certificates were issued to Mr. and Mrs. Kim.  Exhibits 10 and 11.  The parties stipulated Mrs. Kim became a member of the board of directors for YKSI.

[12]  Exhibit 13.

[13]  Exhibits 35, pp. 15-16 and Exhibit 36, pp. 18-19.

[14]  *See* Exhibit 26, Lender's Instruction Letter from Hanmi Bank.

[15]  Exhibit 19.

Kims the S & B Nova Note was worth $163,000 less than the face amount of the note,[16] due to payments previously made by S & B Nova.

On July 14, 2008, the Kims surrendered their shares of YKSI, and resigned as directors. YKSI then assigned the S & B Nova Note to the Kims. According to W. Kim, they received approximately $3,100 monthly on the S & B Nova Note.

YKSI's amended tax return for 2008 reflects the Kims resigned from YKSI on July 14, 2008, and received substitute assets, as well as a payment of $23,000 in cash.[17] However, the Kims never received a $23,000 payment. Rather, Y. Sun paid $23,000 to her sister, Yeorang Kim.[18]

In January, 2009, H. Sun again approached the Kims. He told the Kims if they wished to protect their investment, they would need to exchange their interest in the S & B Nova Note for shares of stock in S & B Nova.[19] H. Sun indicated the transaction would make Y. Kim (who would hold the shares) a 24% shareholder in S & B Nova. He informed the Kims that certain covenants associated with existing loans to S & B Nova prevented the Kims from acquiring more than a 24% interest. Therefore, S & B Nova would also issue two new promissory notes, both payable to W. Kim, in the amount of $260,000 and

---

[16] The discrepancy was apparently due to a prior payment made to YKSI from S & B Nova, but the evidence does not show the purpose of such payment. Exhibit 20 is a copy of the S & B Nova Note with a handwritten notation indicating the $163,000 reduction. However, W. Kim testified he did not see that document until after the transaction, and the Court finds his testimony credible. *See* Transcript, March 20, 2014, p. 162, lines 1-3. The Court also notes the Suns' attorney's attempt to indicate the note's reduced value of $872,665 was somehow tied to the Kims' giving up $240,000 of the note's principal to gain the S & B Nova stock to be inapposite, since the stock transaction took place six months later. *See* Transcript, March 20, 2014, p. 162, line 9 - p. 163, line 6. Moreover, W. Kim testified he understood the stock and the two notes to represent the value of the $872,665 interest only after H. Sun explained to him the actual value of the S & B Nova Note was less than the face value. *Id.*, p. 163, lines 10-13.

[17] Exhibit 36, pp. 18 and 22.

[18] Transcript, March 21, 2014, p. 125, line 5–p. 127, line 8. Y. Kim noted, however, she loaned the Suns $25,000 on November 11, 2007. *See* Exhibit 16. She stated Y. Sun repaid $22,000 of that amount on December 28, 2007. *See* Exhibit 17. The parties presented no further evidence as to this $25,000 loan. Interestingly, the $22,000 repayment check had "West Colfax" written on the memo line, and was drawn on the same individual bank account at US Bank into which Y. Sun deposited the Kims' $900,000. The Court further notes the parties disputed whether Yeorang Kim was Y. Sun's biological sister or close friend, but the Court finds this issue to be irrelevant.

[19] *See* Exhibit 22, Consent for Transfer of Shares in S & B Nova, signed by Hee Sook Lee.

$372,000.[20]  H. Sun told the Kims S & B Nova owned a gas station, a convenience store, and a check cashing business, in addition to the Mississippi Property.

On January 13, 2009, the original S & B Nova Note was canceled.[21]  Y. Kim was issued the S & B Nova shares.  However, H. Sun had convinced the Kims to give 5% of the S & B Nova stock to Y. Sun, citing the Suns' tax problems.  Therefore, Y. Kim received only 19% of S & B Nova's stock.

Over the lives of these transactions, the Kims received payments in the aggregate amount of $109,794 over four years.  They have received no payments since 2011.  Subsequently, S & B Nova was liquidated and the Lees filed for bankruptcy protection.[22]

## DISCUSSION

Section 523(a) exceptions to discharge must be "narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor."[23]  The claimant bears the burden of proving nondischargeability under § 523(a) by a preponderance of the evidence.[24]

## A.    11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) states in relevant part:

(a)  A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

. . .

        (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

---

[20]  *See* Exhibits 24 and 25, New Promissory Notes dated January 13, 2009.

[21]  *See* Exhibit 23.

[22]  Transcript of March 20, 2014, p. 110, line 15-p. 111, line 2.  *See also* Transcript of March 26, 2014, p. 46, lines 3–7 (testimony of Y. Kim).

[23]  *Oklahoma Dep't of Sec., ex. rel. Faught v. Wilcox*, 691 F.3d 1171, 1174 (10th Cir. 2012) (citing *In re Sandoval*, 541 F.3d 997, 1001 (10th Cir. 2008)).

[24]  *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . .[25]

A claimant may sustain a claim under § 523(a)(2)(A) by proving false pretenses, false representation or actual fraud, and these three independent causes of action require proof of different elements.[26]  The Bankruptcy Appellate Panel for the Tenth Circuit explained the § 523(a)(2)(A) framework as follows:

> To sustain a claim for false representation under Section 523(a)(2)(A), the claimant must prove by a preponderance of the evidence that: 1) the debtor made a false representation; 2) with the intent to deceive the creditor; 3) the creditor relied on the false representation; 4) the creditor's reliance was [justifiable]; and 5) the creditor was damaged as a result.  *Fowler Bros v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).  Intent to deceive can be inferred from the totality of the circumstances.  *Copper v. Lemke (In re Lemke)*, 423 B.R. 917, 922 (10th Cir. BAP 2010) (citing *Young*, 91 F.3d at 1375).

> False pretenses under Section 523(a)(2)(A) are implied misrepresentations intended to create and foster a false impression. . . . False pretenses can be "defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor."  *Stevens v. Antonious (In re Antonious)*, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006) (citing *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1019 (Bankr. N.D. Ill. 1996)).

> A claimant may also sustain a claim under Section 523(a)(2)(A) by proving that the debtor engaged in actual fraud. . . . Actual fraud occurs "when a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right."  *Id.* at 690 (quoting

---

[25]  § 523(a)(2)(A).

[26]  *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 222-223 (10th Cir. BAP 2013); *see also Diamond v. Vickery (In re Vickery)*, 488 B.R. 680, 691 (10th Cir. BAP March 13, 2013), *appeal docketed*, No. 13–1148 (10th Cir. April 11, 2013) (recognizing "[i]n order to give full effect to the plain meaning of the disjunctive 'or' in § 523(a)(2)(A), we conclude that 'actual fraud' is an independent basis for nondischargeability under that subsection.").

*Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (6th Cir. BAP 2001)).[27]

While the elements for each theory under § 523(a)(2)(A) differ, the common thread is a debtor's intent to defraud a creditor.

### 1.   False Representations

To sustain a claim of false representation, the Kims must prove the following elements: 1) the Suns made a false representation or material omission; 2) the Suns made the representation or omission with the intent to deceive the Kims; 3) the Kims relied on the representation or omission; 4) the Kims' reliance was justifiable; and 5) the Suns' representation or omission caused the Kims to sustain damages.[28]

### a.   False Representations and Material Omissions.

The evidence clearly shows both Suns made material false representations and omissions to the Kims.  Specifically, H. Sun represented the Kims' $900,000 would be spent on the JCRS Property.  Instead, Y. Sun convinced Y. Kim to give her a $900,000 check, which Y. Sun deposited in her separate account.  The Suns then spent the $900,000 as they chose.[29]  H. Sun admitted only about $57,137 of these funds actually went to the JCRS project.[30] Y. Sun therefore misled Y. Kim as to where the funds were deposited, and H. Sun misled the Kims as to how the money was to be used.[31]

Thereafter, H. Sun convinced the Kims to return the YKSI shares in exchange for the interest in the S & B Nova Note, but failed to inform them the note was subordinate to the Hanmi Bank note.  While it is true the Kims received income payments from S & B Nova for several years, the failure to inform them of a $1.7 million senior lien on the note's collateral significantly misrepresented the risk of the investment.

---

[27]  *Id.*

[28]  *See Field v. Mans, supra*, at 70; *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2010).

[29]  *See* Exhibit 14, schedule of checks written by Y. Sun on the newly-opened US Bank account, and Exhibit 15, copies of the same.

[30]  Transcript, March 27, 2014, p. 96, line 15 - p. 97, line 17.

[31]  Further, according to W. Kim, H. Sun told him because the investment was for 50% of the company and the company owned real estate, this was a 50% sale of property.

The Suns' argument they offered to let the Kims "back in" to the JCRS Property does not excuse the misrepresentations and omissions.  In any event, such an assertion is speculative.  No evidence showed any discussion of terms of such a deal.

       b.    <u>The Suns Intended to Deceive the Kims.</u>

"Intent to deceive under [§ 523(a)(2)(A)] may be inferred from the totality of the circumstances, and includes reckless disregard of the truth.  Moreover, the *scienter* requirement may be established by material omissions."[32]

Here, the Suns deny intending to defraud the Kims, but their actions clearly tell otherwise.  The Suns did not observe corporate formalities.  H. Sun never treated Y. Kim as the 50% owner of YKSI.  Instead, he sold the Mississippi Property without informing the Kims or seeking their approval, even though Y. Kim was a director of YKSI.[33]  In addition, following Y. Sun's intentional ruse to deposit the Kims' $900,000 into a non-corporate account, the Suns proceeded within a few months to spend the $900,000 largely on non-JCRS expenses.[34]

Further, H. Sun acknowledged he received an offer to purchase the JCRS Property in July 2007, approximately two months after the Kims made their investment.  The offer was for $4.95 million.  H. Sun claims he rejected the offer because it was contingent on the JCRS Property being fully leased, which it was not at the time.[35]  When asked if he told W. Kim about the offer, he stated:

Q Did you tell the Kims about this offer?

A Yes, to Mr. Kim.  I told Mr. Kim that we cannot sell the [JCRS Property] because the property is not open yet, you know, so I didn't want to sell the property for that particular amount either.

Q Did you ask Mr. Kim how he would vote on selling the [JCRS Property]?

---

[32] *Columbia State Bank v. Daviscourt (In re Daviscourt)*, 353 B.R. 674, 685 (10th Cir. BAP 2006).

[33] Transcript, March 27, 2014, p. 70, line 21–p. 71, lines 1-5.

[34] *See* Exhibits 14 and 15.

[35] *See* Exhibit 44; Transcript, March 27, 2014, p. 70, line 21–p. 71, lines 1-5.

A  Well, at the time he was not in the position because I was to take care of all the responsibilities in terms of managing and operating the whole business there.  If we are to lose the money, then I'll lose the money.  If we have to make money, then we'll split the profits. That's what was the situation at the time.[36]

Then, when under financial distress, the Suns persuaded the Kims to switch their investment to a note obtained in a sale of which the Kims had not been informed, and from which the Kims had received none of the cash paid to YKSI.  H. Sun demonstrated at the very least reckless disregard for the truth by failing to tell the Kims the S & B Nova Note was subordinate to the Hanmi Bank note.  For these reasons, the Court finds the totality of the circumstances clearly shows both Suns' intent to defraud the Kims.

### c.   The Kims Justifiably Relied on the Suns' Misrepresentations and Omissions.

The Kims testified they relied on the Suns' misrepresentations because the Suns were close friends and H. Sun had a reputation as a knowledgeable and successful real estate investor.  The Court finds this line of testimony to be credible.  The question is whether such reliance was justifiable.  The standard "is not 'reasonableness' in the sense of whether an objectively reasonable person would have relied upon the debtor's false representations.  Rather, the correct inquiry is whether the actual creditor's reliance was 'justifiable' from a subjective standpoint." [37]  As noted by Judge Tallman:

In order for the Plaintiff to have justifiable reliance on a representation under 11 U.S.C. § 523(a)(2)(A), the Plaintiff need only perform a cursory inspection of the representation to the extent that it should be very obvious that the representation is fraudulent.  *Field v. Mans*, 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).  Justifiable reliance is not reasonable reliance, so the objective reasonable person standard does not apply; it is merely what a cursory examination of the representation would uncover.  *Id.* at 72, 116 S.Ct. 437.[38]

---

[36]  Transcript, March 27, 2014, p. 71, lines 6–18.

[37]  *Johnson v. Riebesell, supra,* at 791-92.

[38]  *Adams County Dept. of Social Services v. Sutherland-Minor (In re Sutherland-Minor)*, 345 B.R. 348, 354, n.4 (Bankr. D. Colo. 2006).  *See also Field v. Mans*, 516 U.S. at 74 and *Fowler Bros. v. Young*, 91 F.3d at 1373.

In this case, the Court finds the Kims justifiably relied on the Suns' misrepresentations.  W. Kim is well-educated, but his area of expertise is engineering, not finance or real estate.[39]  He does not understand English well and it is undisputed he has little knowledge of investments in the United States. Y. Kim's command of English is similarly limited, and her educational background is in art.  By contrast, H. Sun was well-known in the parties' church and in the community as a successful and wealthy real estate investor.  H. Sun testified he started as a construction worker in the United States in 1985 and worked his way up in the real estate business, becoming experienced with "fix and flip" transactions.[40]  Y. Sun is complicit with the real estate business and writes all the checks under H. Sun's supervision.[41]

The Suns argue the Kims should not have relied on their representations without asking more questions.  However, the Kims offered unrebutted testimony indicating Korean transactions of this type have one attorney representing both parties, and further indicating Korean culture emphasizes trust between friends and the expectation the statement of a friend would be truthful.  While the benefit of hindsight may suggest the Kims should have consulted independent professionals or obtained more information, that is not the legal standard.  The standard is whether people with the Kims' mind set and experience were justified in relying on the Suns, and the Court finds this standard was satisfied.[42]

The Court has considered and accepts the Kims' testimony indicating reputation, trust and status are important in Korean culture, lending to a finding of justifiable reliance.  The Court further finds H. Sun's reputation and his wife's role in his real estate business support a finding of justifiable reliance by the Kims on the Suns.  In addition, the Court finds the close relationship of the parties gives additional weight to a finding the Kims' reliance on their friends' advice was justified.

---

[39]  The only evidence of his attempts at real estate investment involve a very small commercial property in Korea, recommended to him by Y. Kim's brother, which he stated he still owns.

[40]  Transcript of March 27, 2014, p. 5, lines 1-18; p. 14, lines 10-13.

[41]  Transcript of March 27, 2014, p. 10, lines 12-15; p. 67, line 22 through p. 68, line 8.

[42]  *See Williams v. Sato (In re Sato)*, 512 B.R. 241, 249-50 (Bankr. C.D. Cal. 2014) (Although available information might have alerted an investor to fact the debtor was not the prosperous, experienced real estate developer he purported to be, the investor's non-real estate background and lack of prior real estate investment experience meant he justifiably relied the on debtor's showing of prosperity and knowledge).

d.    <u>The Kims Suffered Damages.</u>

The issue of specific damages will be addressed below.  However, the Court notes, for purposes of the elements of fraudulent representation, the Kims' testimony indicates they would not have invested the $900,000 had they known the funds were going to the Suns individually, not Y & K Sun, Inc.[43]  They have lost their initial investment (although they received some payments totaling $109,794 from S & B Nova).  They have therefore established they have suffered damages as a result of the Suns' conduct.

Pursuant to § 523(a)(2)(A), the Court finds the Kims have established the requisite elements of false misrepresentations.

### 2.  False Pretenses

" Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions."[44]  For example, false pretenses may be shown when a debtor's statements and conduct conceal the debtor's true intent.[45]

a.    <u>The Suns made omissions and implied misrepresentations.</u>

The evidence clearly shows each of the Suns made both omissions and implied misrepresentations to the Kims.[46]  Specifically, H. Sun took the Kims and other members of the parties' church to view the JCRS Property, and promoted the impression of his success in real estate investing.  Moreover, H. Sun portrayed the refinancing and new leases as being almost completed, assuring the short-term return of the $500,000 and the expenditure of the remaining

---

[43]  Transcript, March 20, 2014, p. 89, lines 89-90; Transcript, March 21, 2014, p. 113, lines 20-23.

[44]  *Sturgeon*, 496 B.R. at 223 (citing *Marks v. Hentges (In re Hentges)*, 373 B.R. 709, 725 (Bankr. N.D. Okla. 2007) (false pretenses are "implied misrepresentations or conduct intended to create and foster a false impression.") (internal quotations omitted)).

[45]  *See Nielsen v. Pollan (In re Pollan)*, 2014 WL 2756527, at *4 (Bankr. D. Kan June 16, 2014) (Slip Copy) (finding the debtor's statements and conduct in purchasing and financing a car but arranging for a friend to make the loan payments created a false impression the friend would ultimately receive title to the car, concealing the debtor's secret intent to retain ownership).

[46]  The Court also finds that, on the several occasions when the Suns' testimony conflicted with that of the Kims, the Kims' testimony was more credible, while the Suns' testimony was rambling, evasive, and inconsistent.

funds on the JCRS Property.  The SPAs contained similar language.[47]  In addition, the Suns discussed the investment with the Kims so as to create the impression the Kims' money would be spent on renovation of the JCRS Property, all the while planning to deposit the funds in a personal account and use it for their own purposes.

Thereafter, the Suns concealed the true nature of the S & B Nova Note, and created a sense of urgency to convince the Kims to give up their shares of YKSI in exchanges for the note.  The Suns used the same urgency tactic to convince the Kims to exchange their interest in the S & B Nova Note for two lesser notes and shares in S & B Nova.

Particularly striking is the Suns' "moving target" ploy with the Kims.  Over the course of the parties' dealings since 2007, the Suns continuously changed the nature of the Kims' investment.  The Kims' position steadily deteriorated, with less collateral backing their initial $900,000 investment.

> b.    The Suns promoted these omissions and misrepresentations knowingly and willingly.

The Court further finds the Suns intentionally and deliberately misled the Kims in these transactions.  The evidence shows H. Sun was an experienced investor and understood the difference between what he proposed and what the Kims received in all the transactions.  Moreover, Y. Sun obviously knew and intended for Y. Kim to believe the $900,000 was going into a corporate account, when in fact it went to Y. Sun's personal account.

> c.    The Suns created a contrived and misleading understanding by the Kims of the parties' transactions.

The Suns repeatedly assured the Kims their investment was safe, and the Suns were protecting the Kims' interests due to their friendship.  However, the Suns were actually following a quite different agenda of their own, using the Kims' money however they pleased, and moving the Kims' interest to increasingly risky investments.  The Suns deliberately took advantage of their friendship with the Kims, as well as the Kims' relative inexperience in real estate investment. The Suns created a false sense of protection and fair treatment for the Kims' investment.  The real activity, however, allowed the Suns to avoid

---

[47]  *See* Exhibit 9, Stock Purchase Agreement dated May 16, 2007, p. 1, stating Y & K Sun, Inc. as "Seller" seeks capital to renovate and market the JCRS Shopping Center. Further, the Stock Purchase Agreement provided the $900,000 was to be paid to the "Seller," *i.e.* YKSI  *Id.*

repayment of the Kims' $900,000 investment, and eventually regain control of YKSI.

        d.    <u>The contrived and misleading understanding created by the Suns wrongfully induced the Kims to advance money or property to the Suns.</u>

Lastly, the testimony of the Kims demonstrates they were wrongfully induced to participate in the transactions with the Suns.  Specifically, the Suns changed the nature of the JCRS Property transaction, sent fraudulent documents to W. Kim's Korean bank, and otherwise disguised the fact the original $900,000 investment was not a real estate investment.  Thereafter, the Suns engaged in telling half-truths and in omitting crucial facts in inducing the Kims to change this investment in ways that benefitted only the Suns, and damaged the Kims' interest.

For the above reasons, the Court finds the Kims satisfied their burden of proving the Suns obtained money ($900,000) and later property (the YKSI stock and interests in the S & B Nova notes) through false pretenses under § 523(a)(2)(A).

*3.    Actual Fraud*

The Court finds the evidence as set forth above also indicates the presence of actual fraud by the Suns.  The above facts establish the Suns' ongoing pattern of fraud as part of a scheme to obtain the $900,000 from the Kims on the pretense of investing in the JCRS Property, and then to use those funds for their own purposes.  After obtaining the initial $900,000 investment, the Suns continued to mislead the Kims over a period of several years.  During that time, the Suns abused their friendship and community reputation in favor of perpetrating a scheme to prey on the Kims' inexperience and manipulate the Kims' investment for their own benefit.  The Suns did not intend to proceed with the promised real property transaction.  Rather, they sold stock to the Kims, and later recaptured the stock by threatening bankruptcy.  The Suns then persuaded the Kims to accept an interest in a promissory note which was subordinate to a concealed senior lienor.  Finally, they convinced Y. Kim to participate in S & B Nova's business, and to become a shareholder of S & B Nova, accepting two smaller S & B Nova notes.  The Suns failed to disclose these notes were subject to Hanmi Bank's senior position.

In viewing the continuous fraud perpetrated on the Kims, the Court finds the evidence also demonstrates actual fraud by the Suns under § 523(a)(2)(A).

## B.    11 U.S.C. § 523(a)(4)

Pursuant to § 523(a)(4), "(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."[48] The Kims did not present any evidence of a fiduciary relationship between the Kims and the Suns.  Accordingly, the Kims cannot prevail on a claim for fraud or defalcation while acting in a fiduciary capacity.

However, § 523(a)(4) does not require the existence of a fiduciary relationship in order to establish that a debt created by acts of embezzlement or larceny is nondischargeable in bankruptcy.[49]  The difference between embezzlement and larceny has been explained as follows:

> Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.  It differs from larceny in the fact that the original taking of the property was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking.
>
> . . .
>
> In short, section 523(a)(4) excepts from discharge debts resulting from the fraudulent appropriation of another's property, whether the appropriation was unlawful at the outset, and therefore a larceny, or whether the appropriation took place unlawfully after the property was entrusted to the debtor's care, and therefore was an embezzlement.[50]

This Court previously adopted the prevailing five-part standard in this District for embezzlement under § 523(a)(4), requiring evidence of the following:

---

[48]  § 523(a)(4).

[49]  *See Bryant v. Lynch (In re Lynch)*, 315 B.R. 173, 175 (Bankr. D. Colo. 2004) ("A claim for nondischargeability under Section 523(a)(4) may rest on proof of larceny or embezzlement, without requiring proof of a fiduciary relationship.").

[50]  4 Collier on Bankruptcy ¶ 523.10[2] (16th ed.).  *See also Lynch*, 315 B.R. at 179 ("The courts define embezzlement and larceny as having the same elements, with the one distinction that, with larceny, the original taking and possession of property was unlawful rather than authorized."); *Hartwig v. Markley (In re Markley)*, 446 B.R. 484, 489 (Bankr. D. Kan. 2011) ("Embezzlement requires allegations of misappropriation of property of another by a person in whom said property was lawfully entrusted for a specific purpose. Larceny is misappropriation of property of another by theft.").

1) entrustment (originally lawfully obtaining); 2) of the property; 3) of another; 4) misappropriating the property (using it for a purpose other than that for which it is entrusted); and 5) with fraudulent intent.[51]  As noted above, the difference between larceny and embezzlement "is that with embezzlement, the debtor initially acquires the property lawfully, whereas larceny requires that the funds originally come into the debtor's hands unlawfully."[52]

In this case, Y. Sun convinced Y. Kim to give her a $900,000 check, which Y. Kim reasonably believed was to be deposited in the account of YKSI and used for the purposes of renovating and marketing the JCRS Property.  Instead, Y. Sun deposited the check into a recently-opened personal account.  This action constitutes receiving the money wrongfully, and with prior intent, since the personal account was opened under the name "Y. K. Sun" before Y. Kim gave Y. Sun the check.  The remainder of the elements are met, as the funds were not used for their represented purpose, with fraudulent intent.  Thus, the Suns' debt to the Kims is nondischargeable as larceny.[53]

## C.    11 U.S.C. § 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code provides "(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . (6)  for willful and malicious injury by the debtor to another entity or to the property of another entity."[54]  The Tenth Circuit Bankruptcy Appellate Panel has stated the following regarding § 523(a)(6):

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  To state a claim for relief under § 523(a)(6), the creditor must include allegations that would support a reasonable inference that the debtor caused a deliberate or intentional injury to

---

[51]  *In re Meagher*, No. 10-12324 MER, 2012 WL 5893483 (Bankr. D. Colo. Nov. 23, 2012) (following *Bombardier Capital, Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869, 876 (Bankr. D. Colo. 2006) (citing *Bryant v. Tilley (In re Tilley)*, 286 B.R. 782, 789 (Bankr. D. Colo. 2002)).

[52]  *In re Ghaemi*, 492 B.R. 321, 325 (Bankr. D. Colo. 2013).

[53]  Even if Y. Sun had lawfully received and deposited the $900,000 check, which the Court does not believe is the case, the remaining elements of embezzlement have been established.  Thus, absent the requisite wrongful receipt demonstrating larceny, the Court would have found in the alternative the Suns' debt to the Kims is nondischargeable as embezzlement.

[54]  § 523(a)(6).

the creditor. Debts resulting from recklessness or negligence do not fall within § 523(a)(6).

. . .

[A]s the Supreme Court made clear in *Kawaauhau v. Geiger*, an intent to cause injury is required to bring a debt within § 523(a)(6).  Since a person can convert property without intending to injure the interests others may have in the property, a creditor must include allegations suggesting the debtor committed the conversion with the intent to injure to adequately state a claim for relief under § 523(a)(6).[55]

Willfulness "may be established by direct evidence of specific intent to harm a creditor or the  creditor's property.  Willful injury may also be established indirectly by evidence of both the debtor's knowledge of the creditor's . . . rights and the debtor's knowledge that the conduct will cause particularized injury."[56]  The requirement of maliciousness "is satisfied upon a showing the injury was inflicted without just cause or excuse."[57]

As discussed above, the Suns intentionally obtained the Kims' $900,000 check and did not use the majority of it for the represented purposes, but for their personal expenses and non-JCRS business expenses.  It is clear the Kims suffered substantial economic damage in the form of the loss of the majority of their savings.

Further, the Court finds the Suns intentionally and deliberately misled the Kims in several transactions over several years, and the Suns knew or should have known they would cause significant damage to the Kims' financial affairs.  Essentially, the Suns continuously "strung along" the Kims in a scheme not only to avoid repaying their $900,000 investment, but to regain control of YKSI by persuading the Kims to give up their shares in return for various interests in S & B Nova, without disclosing the true nature of those transactions.  In doing so, the Suns obtained the outcome they knew was substantially certain to

---

[55] *Barenberg v. Burton (In re Burton)*, 2010 WL 3422584, *6 (10th Cir. BAP, August 31, 2010) (unpublished decision) (citations omitted).

[56] *Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir. BAP 1999).  *See also Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) (willfulness may be shown where a debtor intends the injury or takes action substantially certain to cause the injury).

[57] *Wagner v. Wagner (In re Wagner)*, 492 B.R. 43, 55 (Bankr. D. Colo. 2013) (citations omitted).

occur—they got most of the Kims' money and the return of the shares of YKSI, and the Kims got virtually none of what they bargained for.  Accordingly, the Court finds, in addition to being nondischargeable under § 523(a)(2)(A) and § 523(a)(4), the Kims' debt is nondischargeble under § 523(a)(6).

## D.   Damages

This case involves two different measures of damages because the Kims sought relief based on fraud and misrepresentation, under both § 523(a)(2)(A) and § 523(a)(6), and relief based on larceny and embezzlement under § 523(a)(4).  However, the Kims are not entitled to double recovery.[58] Therefore, the amount reached by the method giving the lowest recovery will be subsumed into the amount reached by the method resulting in a higher recovery, giving the Kims all the damages to which they are entitled without awarding them a double recovery.

### 1.   Damages Under § 523(a)(4).

As noted by the Bankruptcy Appellate Panel for the Tenth Circuit, "damages for conversion or embezzlement claims are limited to money or property that was used in an unauthorized way. . . ."[59]  As to their § 523(a)(4) claim, the Court concludes the Kims are entitled to recover the money wrongfully taken from them by larceny.  The Kims' actual damages are $900,000, less the aggregate $109,794 they received from the S & B Nova Note, for a total of $790,206.

### 2.   Damages Under § 523(a)(2)(A) and (a)(6).

The proper measure of fraud damages within the § 523 context has been reviewed at length in several opinions in the case of *In re Mascio*.[60]  In *Mascio*, with respect to property regarding which fraud or misrepresentation has been shown, the United States District Court for the District of Colorado (the "District Court") stated:

---

[58]   *See Thomas*, 2013 WL 6840527, at *23.

[59]   *Hernandez v. Musgrave (In re Musgrave)*, 2011 WL 312883, at *11 (10th Cir. BAP Feb. 2, 2011) (Slip Copy); *see also Brown v. Kuwazaki (In re Kuwazaki)*, 438 B.R. 355, at *6 (10th Cir. BAP 2010) (unpublished decision) (citing *Int'l Fid. Ins. Co. v. Fox (In re Fox)*, 357 B.R. 770, 778 (Bankr. D. Ark. 2006); *Telmark, LLC. Booher (In re Booher)*, 284 B.R. 191, 214 (Bankr. W.D. Pa. 2002)).

[60]   *See Gronewoller v. Mascio* (*In re Mascio*), 2007 WL 3407516 (D. Colo. 2007).

Under Colorado law, [the plaintiff] is entitled to receive "the difference between the actual value of the property *at the time of purchase* and its value at that time had the representation been true." . . . Under Colorado law, values prior to or subsequent to the date of payment are irrelevant. . . ."[61]

In this case, the parties reached an agreement for the exchange of promises and performances on May 17, 2007, whereby the Kims agreed to pay $900,000 in exchange for a 50% interest in the JCRS Property.[62]  Although the Kims were hesitant to invest this entire amount because they wanted to retain funds to purchase a house, the Suns induced the Kims to invest the full $900,000 by misrepresenting the JCRS Property would be promptly refinanced. Thus, at the time of the investment, the Kims reasonably believed their $900,000 payment was worth at least the following: short term repayment of $500,000; a $400,000 interest in the JCRS Property (representing 50% or some other percentage); and a $3,000 per month income stream.[63]

To convince the Kims of the safety of the proposal, H. Sun gave the Kims an appraisal of the JCRS Property as of May 2006, valuing the real property at $4.3 million.  This appraisal stands as the most recent professional opinion of value as of May 17, 2007, supporting a finding the Kims' investment was worth at least $2.15 million at the time it was made.  H. Sun also told W. Kim the

---

[61] *Mascio v. Gronewoller* (*In re Mascio*),  454 B.R. 146 (D. Colo. 2011).  Further, the District Court stated:

Under Colorado law, "the measure of damages in [fraud] cases is the 'benefit of the bargain' rule, designed to give a plaintiff his or her expectation interest for loss of bargain." *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 677 n. 5 (Colo. 1994). Thus, a plaintiff is entitled to receive "the difference between the actual value of the property and what its value would have been had the representation been true." *Otis & Co. v. Grimes*, 97 Colo. 219, 48 P.2d 788, 791 (1935).

*Id.* at 150 n.4.  *See also Immel v. Tani (In re Tani)*, 2012 WL 2071766 (Bankr. D. Colo. June 8, 2012) (Slip Copy) (applying the *Mascio* standards).

[62]  May 17, 2007, is when the parties entered into the bargain, thus it is the date governing the valuation of damages.

[63]  The parties did not discuss the effect of the return of the $500,000 to the Kims.  It is therefore not clear whether the Kims would have then had their 50% interest in the JCRS Property or YKSI reduced by 60%, giving them a 20% interest.  The fact the Suns did not discuss this with the Kims provides further support of the Suns' intent to conceal the true nature of the transaction.

actual value of the JCRS Property was approximately $6 million,[64] and suggested to Y. Kim the JCRS Property could be sold in three to four years for as much as $8 million.[65]   Under such a scenario, the Kims would receive a return of $1 million on their $400,000 remaining investment after repayment of $500,000. However, the Court finds the $8 million valuation is speculative, and cannot be considered as reliable.

Regardless of the value used within the $4.3 million to $6 million range, the representations made by H. Sun to the Kims provided a false impression of equity in the JCRS Property.  The Kims reasonably relied on these values for the JCRS Property, and at the time of the transaction, believed the JCRS Property was worth more than enough to cover repayment of $500,000 in the short term, and protect their remaining $400,000 investment with an ongoing income stream of approximately $3,000 per month.

After obtaining the $900,000, the Suns changed the terms of the deal to give the Kims a one-half interest in YKSI, which owned the JCRS Property.[66] The Suns represented this interest had the same value as the originally proposed $500,000 short-term repayment, $400,000 ownership interest, and the monthly income stream.

The Kims did not receive what they bargained for in return for their investment of $900,000.  They did not receive $500,000 following a refinancing, because the Suns stopped trying to refinance the JCRS Property.  They did not receive any income stream from the JCRS Property.  They never received $400,000 or $900,000 in return for their shares of YKSI, or any appreciation on their investment.  Instead, the Suns fraudulently convinced the Kims to surrender those shares in return for the S & B Nova Note, without telling the

---

[64]  *See* Transcript of March 20, 2014, p. 140, lines 10– 22 (testimony of W. Kim).

[65]  *See* Transcript of March 2, 2014, p. 86, lines 19–24 (testimony of Y. Kim):

Well, at the time Mr. Sun said, you know, if you sell this property in the near future, then maybe you could sell it for $8 million and if that happens then maybe you could split the profit proceeds, like a half, you know, 50-50, which will come to $1 million each, so $1 million for Professor Kim and $1 million for me, Mr. Sun.

[66]  It is unclear when the Kims became aware YKSI owned other assets besides the JCRS Property.  *See* Transcript of March 20, 2014, p. 154, lines 2–12 (testimony of W. Kim). However, H. Sun testified he believed the $900,000 stock transaction pertained "only to the one building," presumably the JCRS Property.  *See* Transcript of March 26, 2014, p. 88, lines 8-12 (testimony of H. Sun).

Kims the note was subordinate to a senior lien on property owned by S & B Nova.

The only funds the Kims ever saw following their investment of $900,000 was the $109,794 paid over several years on the various S & B Nova notes. Therefore, the difference between what the Kims bargained for and what they received, valued as of May 17, 2007, may be expressed as follows:

1. The Kims paid $900,000.

2. The Kims were to receive:

   a) $500,000 repayment;

   b) $400,000 in value for a one-half interest in the real estate or an interest in the company that owned the real estate, which interest was valued at the time at between $4.3 million and $6 million, with a potential for appreciation;

   c) $3,000 per month from six months after the investment (November 2007 through the month of this Order, or 78 months at $3,000 per month for a total of $252,000).

Total: $1,152,000

3. The Kims received: $109,794.

4. $1,152,000 less $109,794 equals total benefit of the bargain damages of $1,042,206.


**E.    The Kims Are Not Entitled to Attorneys' Fees and Costs, But Are Entitled to Prejudgment Interest and Postjudgment Interest.**

   *1.    Attorneys' Fees and Costs.*

The Kims' Closing Argument argues, for the first time in this adversary proceeding, as follows:

The Stock Purchase Agreement of May 16, 2007 (Exhibit 9, p. 4), states that Y&K Sun shall indemnify the Kims related to all "interest," "damages, losses, costs and expenses (including attorneys and experts fees and court costs) of every kind and nature" resulting from "misrepresentation or breach by [Y&K Sun] of any representation or

warranty" and "nonfulfillment, failure to comply or breach" of any "covenant, promise or agreement." The Stock Purchase Agreement is also construed in accordance with Colorado law (Exhibit 9, p. 6).

Y&K Sun is an *alter ego* of the Suns. Pursuant to *McCallum Family LLC v. Winger*, 221 P.3d 69, 73-74 (Colo. App. 2009), Courts look at the following non-exhaustive list of factors to determine alter ego status: (1) the corporation is operated as a distinct business entity; (2) funds are commingled; (3) adequate corporate records are maintained; (4) the nature and form of the entity's ownership and control facilitate misuse by an insider; (5) the business is thinly capitalized; (6) the corporation is used as a "mere shell;" (7) legal formalities are disregarded; and (8) corporate funds are assets are used for non-corporate purposes.

The evidence in this case has proved that the corporation is a mere instrumentality for the transaction of the Suns' own affairs and vice versa; it was not operated as a distinct business entity, funds were commingled, adequate corporate records were not maintained, and the form of the corporation's control facilitated pervasive misuse by the Suns. Clear and convincing evidence shows the guise of investment in Y&K Sun was used to perpetrate fraud on the Kims and weighs in favor of piercing the corporate veil. Achieving an equitable result is the paramount goal of piercing of the corporate veil.

When the corporate structure is used so improperly that recognition of the corporation as a separate legal entity would be unfair, the corporate entity may be disregarded. Here, equity permits Y&K Sun's corporate form to be disregarded. Accordingly, pursuant to the Stock Purchase Agreement, the Kims request they be awarded attorneys' fees and costs, as well as prejudgment and post-judgment interest, all at 8% compounded annually per COLO. REV. STAT. § 5-12-102.[67]

The Kims assert, although they did not include an *alter ego* claim in their Complaint, they should be allowed to seek such a finding because the evidence presented at trial demonstrated *alter ego* and veil piercing claims, and was submitted without objection. The Court disagrees.

The Kims rely on FED. R. CIV. P. 15(b)(2), which states:

---

[67] Plaintiff's Written Closing Argument, Docket No. 77, pp. 21-22 (footnotes omitted).

When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.  A party may move—at any time, even after judgment—-to amend the pleadings to confirm them to the evidence and to raise an unpleaded issue.  But failure to amend does not affect the result of the trial of that issue.[68]

It is undisputed the Suns did not expressly consent to trying issues of *alter ego* or piercing the corporate veil.  Rather, the Kims contend the matters were tried by implication by failure of the Kims to object to the Kims' evidence.  The United States Court of Appeals for the Tenth Circuit has noted implied consent in such matters is obtained when 1) the party said to be consenting by implication introduces its own evidence on the issue; or 2) failing to object when the opposing party introduces such evidence.[69]  However, implied consent cannot be based on "the introduction of evidence that is relevant to an issue already in the case if the party presenting the evidence does not indicate that it intended to raise a new issue."[70]

Here, the Kims introduced evidence to show the fraudulent behavior of the Suns.  The Kims did not indicate until their closing argument this same evidence was intended to raise additional claims for *alter ego* and piercing the corporate veil.  Therefore, the Kims have not shown issues of *alter ego* and piercing the corporate veil were tried by implication, and the Court will deny their request for attorneys' fees and costs arising from that argument.

Furthermore, as it relates to *alter ego* and piercing the corporate veil, such evidence would, at best, support a finding the Suns observed corporate formalities only when it served their own purposes.[71]  However, this is only one isolated factor to consider in the overall *alter ego* prong of a veil piercing

---

[68] FED. R. CIV. P. 15(b)(2).

[69] *Eller v. Trans Union, LLC*, 739 F.3d 467, 480 (10th Cir. 2013).

[70] *ACE, USA, v. Union Pacific R. Co., Inc.*, 2011 WL 6097138, at *4 (D. Kan, Dec. 7, 2011) (Not Reported in F. Supp. 2d) (citing *Green Country Food Market, Inc. v. Bottling Group, LLC*, 371 F.3d 1275, 1280 (10th Cir. 2004); *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1218 (10th Cir. 2000); and *Moncrief v. Williston Basin Interstate Pipeline Co.*, 174 F.3d 1150, 1162) (10th Cir. 1999).

[71] *See* Plaintiff's Written Closing Argument, *supra*, pp. 20-21, and citations to the record therein.

analysis.[72]  Even if the Court permitted this claim as tried by implication, which the Court is not inclined to do, the Kims failed to present sufficient evidence necessary to satisfy the high evidentiary standard for piercing the corporate veil.[73]  Thus, the Court determines an award for attorneys' fees and costs under this theory is improper.

However, while there is no bankruptcy statute or rule specifically providing for attorney fees in the context of § 523(a)(2), (a)(4) and (a)(6), FED. R. BANKR. P. 7054(b) provides for an award of costs to the prevailing party.[74]  As set forth herein, the Kims are the prevailing parties, and the Suns were put on notice of the potential award of costs as early as the Kims' Complaint in this proceeding.  In this case, the Court in its discretion finds an award of costs in favor of the Kims is appropriate.  Thus, the Court will allow reimbursement of costs incurred by the Kims in connection with this  Adversary Proceeding in accordance with FED. R. BANKR.P. 7054 and 28 U.S.C. § 1920.[75]

---

[72]  Colorado law provides piercing the corporate veil "is appropriate when three elements are present:  (1) the corporation was a mere *alter ego* of the shareholder, (2) the corporate structure was used to perpetrate a wrong, and (3) piercing the corporate veil would achieve an equitable result."  *In re Burton*, 2010 WL 3422584, at *5 (10th Cir. BAP 2010) (unpublished decision).

[73]  "A claimant seeking to pierce the corporate veil must make a clear and convincing showing that each consideration has been met."  *Connolly v. Englewood Post No. 32 VFW, et al v. Phillips (In re Phillips)*, 139 P.3d 639, 644 (Colo. 2006) (citing *Contractors Heating & Supply Co.*, 432 P.2d 237, 239 (Colo. 1967)).  *See also In re First Financial Services, LLC*, 2011 WL 2971841, at *7 (Bankr. D. Colo. July 21, 2011) (Slip Copy); *In re First Assured Warranty Corporation*, 383 B.R. 502, 527 (Bankr. D. Colo. 2008) (both relying on *Phillips*).  Veil-piercing remains the exception, not the rule, and the corporate veil will be pierced only in "extraordinary circumstances."  *Phillips*, 139 P.3d at 644 (citing *Leonard v. McMorris*, 63 P.3d 323, 330 (Colo. 2003) and *Water, Waste & Land, Inc. v. Lanham*, 955 P.2d 997, 1004 (Colo. 1998)).

[74]  FED. R. BANKR. P. 7054 provides:

(a) Judgments.  Rule 54(a)-(c) F.R.CIV.P. applies in adversary proceedings.

(b) Costs.  The court may allow costs to the prevailing party except when a statute of the United States or these rules otherwise provides.  Costs against the United States, its officers and agencies shall be imposed only to the extent permitted by law.  Costs may be taxed by the clerk on 14 days' notice; on motion served within seven days thereafter, the action of the clerk may be reviewed by the court.

[75]  28 U.S.C. § 1920, taxation of costs, provides:

A judge or clerk of any court of the United States may tax as costs the following:

2.    *Prejudgment and Postjudgment Interest.*

As recently noted by Judge Elizabeth Brown of this Court:

> Under federal law, prejudgment interest may generally be awarded if "1) the award of prejudgment interest would serve to compensate the injured party, and 2) the award of prejudgment interest is otherwise equitable." *In re Bakay*, 454 Fed. Appx. at 654 (citing *In re Inv. Bankers, Inc.*, 4 F.3d 1556, 1566 (10th Cir.1993)). "Thus under federal law prejudgment interest is ordinarily awarded, absent some justification for withholding it." *Id.* (citing *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1256 (10th Cir.1988)). However, prejudgment interest is not recoverable as a matter of right but is instead governed by considerations of fundamental fairness. *Id.* The decision to award prejudgment interest is a matter left to the sound discretion of the trial court. *In re Butcher*, 200 B.R. at 680.[76]

The Court concludes the circumstances of this case warrant an award of prejudgment interest at the Colorado statutory rate accruing from the date of the parties' bargain – May 17, 2007. Therefore, prejudgment interest shall be awarded as requested in the Kims' Complaint, at the rate of 8% per annum, compounded annually, pursuant to COLO. REV. STAT. § 5-12-102.

---

(1) Fees of the clerk and marshal;

(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

[76] *McArthur Company v. Cupit (In re Cupit)*, ___B.R.___, 2014 WL 3849951, at *9 (Bankr. D. Colo. July 18, 2014).

In addition, the Court finds the Kims are entitled to postjudgment interest from the date of judgment until paid at the rate set forth in 28 U.S.C. § 1961.[77]

## CONCLUSION

For the above reasons,

IT IS ORDERED the debt of Defendants Hyungkeun Sun and Yeonam Kim Sun to Plaintiffs Wonjoong Kim and Yoonee Kim is nondischargeable pursuant to § 523(a)(2)(A), (a)(4) and (a)(6).  A final Judgment shall enter in favor of Plaintiffs and against Defendants in the amount of $1,042,206, plus prejudgment interest from May 17, 2007, through the date of the final judgment at 8% per annum, compounded annually, plus postjudgment interest at the rate set forth in 28 U.S.C. § 1961, plus costs incurred in connection with this adversary proceeding in accordance with FED. R. BANKR.P. 7054 and 28 U.S.C. § 1920.  Each party shall bear its own attorneys' fees.

IT IS FURTHER ORDERED that within fourteen (14) days from the date of this Order, the Kims shall file a bill of costs pursuant to FED. R. CIV. P. 7054 containing their total expenses under 28 U.S.C. § 1920 incurred in connection with this adversary proceeding.

Dated September 12, 2014             BY THE COURT:

Michael E. Romero, Chief Judge
United States Bankruptcy Court

---

[77]   28 U.S.C. § 1961 provides, in part: "Interest shall be allowed on any money judgment in a civil case recovered in a district court."